UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JAMES TRAYLOR,                        )
                                      )
                    Petitioner,       )        Case No. 4:03-cv-26
                                      )
v.                                    )        Honorable Richard Alan Enslen
                                      )
JANETTE PRICE,                        )
                                      )        **REPORT AND RECOMMENDATION**
                    Respondent.       )
_____)

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Because Petitioner filed his habeas application after the enactment of the Antiterrorism and

Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"), the provisions of that

law govern the scope of the Court's review.  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).

Petitioner is serving a prison term of twenty-five to fifty years, imposed by the Wayne

County Circuit Court on July 30, 1999, after a jury convicted Petitioner of second-degree murder,

MICH. COMP. LAWS § 750.317.  In his *pro se* petition, Petitioner raises two grounds for relief, as

follows:

    I.      THE PROSECUTOR'S MISLEADING AND EXCESSIVE COMMENTS ON THE ABSENCE OF AN ALIBI WITNESS THE PROSECUTOR KNEW THE DEFENDANT COULD NOT PRODUCE AMOUNTED TO MISCONDUCT AND VIOLATED TAYLOR'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO CROSS-EXAMINE WITNESSES AGAINST HIM.

    II.     THE TRIAL COURT ERRED IN REFUSING TO GRANT JAMES TRAYLOR'S REQUEST FOR A COGNATE LESSER INCLUDED OFFENSE INSTRUCTION ON ASSAULT WITH INTENT TO DO GREAT BODILY HARM LESS THAN MURDER WHEN THE EVIDENCE SUPPORTED A JURY FINDING THAT THE ASSAULT DID NOT CAUSE DEATH.

Respondent has filed an answer to the petition (docket #16) stating that the grounds are without merit.  Upon review and applying the AEDPA standards, I find that Petitioner is not entitled to habeas corpus relief.  Accordingly, I recommend that the petition be denied.

### Procedural History

#### A.  Trial Court Proceedings

Petitioner was charged with second-degree murder arising from the murder of Stacey Hill in the City of River Rouge on June 3, 1998.  The prosecutor's theory was that Petitioner bludgeoned Hill with a section of 2"x4".  Hill died the following day from her injuries.  The defense theory was that Hill's boyfriend, Rico Eady, committed the murder.  Petitioner was tried before a jury beginning July 12, 1999, and concluding on July 15, 1999.

Petitioner testified that he had been acquainted with Stacey Hill for about three years because Hill's boyfriend, Rico Eady, was the brother of Petitioner's girlfriend, Darlene Eady.  (Tr III, 98.)  On the morning of June 3, 1998, Petitioner walked over to Hill's house at 7:00 a.m.  Petitioner was wearing a black baseball cap and a red or orange jacket.  (Tr III, 110.)  Petitioner and Hill went to the Family Independence Agency to get food stamps.  (Tr III, 101-102.)  They cashed some of the food stamps to purchase alcohol and returned to Hill's house.  (Tr III, 102.)  While they were drinking, they talked about Rico Eady and Hill used some cocaine.  (Tr III, 103.)  Petitioner testified that Hill and Eady "fought all the time," and he had pushed her down the stairs.  (Tr III, 109.)  Eady eventually was evicted from the residence.  While Petitioner was at Hill's house, her step-father, James Longberger, stopped by.  (Tr III, 104.)  Petitioner had a conversation with

Longberger on the front porch.  (Tr III, 104-105.)[1]  After Longberger left, Hill and Petitioner drove up to Viser Road, where she purchased more drugs.  (Tr III, 105.)  Hill then dropped off Petitioner near his friend Darren Ewing's house.  (Tr III, 106.)  According to Petitioner, he stayed at Ewing's house from 4:00 or 5:00 p.m. until about 8:30 p.m.  (Tr III, 106-107.)  Petitioner testified that he left Ewing's house and went to the home of another friend, Terry Harrison, where he stayed overnight. (Tr III, 107-108).  Petitioner testified that he did not return to Hill's house that night.  (Tr III, 108.) Petitioner testified that he was 6'1" tall.  (Tr III, 127.)

Several of Hill's neighbors testified regarding the events of June 3, 1998.  Rosa Daniels testified that she twice saw Hill going into her house before noon with a man Daniels did not recognize.  (Tr II, 72.)  Daniels saw the same man that afternoon sitting on the front porch with Mr. Longberger.  (Tr II, 72-74.)   Daniels saw the man again later that night when he was in Hill's car.  (Tr II, 75.)  The car alarm was going off and Daniels stepped out and told the man he had to turn the alarm off before the car would start.  (Tr II, 75.)  The man asked her if she knew how to turn off the alarm, and she said, "no".  (Tr II, 75-76.)  After that, the man got out of the car, took a couple of steps, and then ran away.  (Tr II, 76.)  Each time Daniels saw him, the man was wearing the same baseball cap.  (Tr II, 75, 78.) Daniels could not positively identify Petitioner as the man.  (Tr II, 77.)

Cheryl Toliver also saw a man sitting on the front porch with Mr. Longberger.  (Tr II, 85-86.)  He was about six feet tall with a dark brown complexion, and was wearing a baseball cap, a red and black jacket and jeans.  (Tr II, 91.)  At 8:30 or 9:00 p.m., Toliver saw the same man

---

[1] Hill's step-father, James Longberger, testified that he visited Hill at her home on the afternoon of June 3, 1998. (Tr II, 35.)  When he arrived, Hill and Petitioner came out from the same bedroom.  (Tr II, 41.)  Longberger talked with Petitioner on the front porch for five or ten minutes.  (Tr II, 40.)  According to Longberger, Petitioner was wearing a jacket and baseball cap (Tr II, 43.)

coming out of Hill's house carrying what looked like an umbrella, but turned out to be a piece of 2"x4". (Tr II, 86-87, 95.) Toliver saw the man try to start Hill's car, and overheard his conversation with Ms. Daniels. (Tr III, 87.) When the man could not get the car started, Toliver saw him walk away down the side walk and then run down the alley. (Tr II, 87.) Toliver was positive that the man who came out of the house with the 2"x4" was the same man she saw earlier on the porch with Mr. Longberger. (Tr II, 90, 92.) Toliver did not get a good look at the man's face, but testified that he had the same build as Petitioner. (Tr II, 92-93, 95.) She further testified that the man was not Rico Eady. (Tr II, 90.)

Another neighbor, Anthony Givens, positively identified Petitioner as the man who was leaving Hill's house that evening. About a week before Hill's murder, Givens had seen Petitioner at Hill's house with Rico Eady. (Tr II, 102.) Givens testified that he saw Petitioner with Hill at her home on the morning of June 3, 1998. (Tr II, 100-104.) Petitioner was wearing a black hat with a bill and a jacket. (Tr II, 132.) Givens also saw Petitioner talking to Mr. Longberger on the front porch of Hill's house at 3:30 or 4:00 p.m. (Tr II, 105.) Later that evening, Givens saw Petitioner coming out of Hill's house with a 2"x4", and walk to Hill's car. (Tr II, 106-107.) Petitioner tried to start the car, but left without the board when the car would not start. (Tr II, 107.) Givens was positive that Petitioner was the man he saw on the porch talking to Mr. Longberger and later walking out of Hill's house with the stick. (Tr II, 110-111, 118.) Givens picked Petitioner out of a photographic lineup the day after the murder. (Tr II, 112-15.)

Petitioner's ten-year-old niece, Eboni Otler, testified that she saw Petitioner and Hill together at about 7:35 p.m. on June 3, 1998. (Tr III, 75-81.) Eboni further testified that Petitioner

- 4 -

had a cast on his leg on June 3. (Tr III, 83.)  Defendant denied that he had a cast, and said that his

niece was mistaken.  (Tr II, 111-112.)

The remaining two witnesses, Noel Malone and Corey Brown, testified that at about

9:30 p.m. on June 3, 1998, they saw a man leave Hill's home with a 2"x4".  (Tr II, 57, 68, 166.)

Neither of them had seen the man before.  (Tr II, 60.)  The man walked to Hill's car, got in the car,

and tried to start it.  (Tr II, 57, 166.)  When the car would not start and the alarm sounded, he left the

car without the 2"x4" and ran down the alley.  (Tr II, 57, 166.)  Malone and Brown described the

man as 5'11" or taller, medium build, dark brown skin and was wearing a black baseball cap and

jacket.  (Tr II, 60-61, 167-68.)  Malone testified that the man he saw was not Rico Eady.  (Tr II, 67,)

but  was unable to positively identify Petitioner as the man he saw on June 3.

After the man left, Hill's neighbors knocked on her door.  When Hill did not answer,

they called the police and Hill's mother, Beverly Longberger.  Hill's doors were locked, so the police

officers kicked-in the side door to gain entry.  (Tr II, 153; Tr III, 48-49.)  They found Hill lying face-

down on the floor.  (Tr II, 154.)  She was unconscious and bleeding profusely from the head.  (Tr II,

154.)  She was taken to the hospital, where she died the following day from her head injuries.  (Tr III,

11.)  According to the pathologist who conducted the autopsy, Hill was struck three times in the right

forehead with a "straight, hard object" that broke her skull.  (Tr III, 15.)  She  also sustained injury

to her right hand.  (Tr III, 13.)  The injuries were consistent with blows by a 2"x4".  (Tr III, 22-23.)

Police officers recovered a  three-foot-long piece of 2"x4" from the front floor board of Hill's car.

(Tr III, 49-50.)  The 2"x4" found in Hill's car had blood on one end.  (Tr III, 63, 86.)

At the conclusion of trial, the jury found Petitioner guilty of second-degree murder. (Tr. IV, 40.)  On July 30, 1999, Petitioner was sentenced to serve a term of 25 to 50 years. (Sentencing Transcript, ("S. Tr."), 10, docket #27.)

## B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on March 30, 2000, raised the same two issues as raised in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #28.)  By unpublished opinion issued on October 12, 2001, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 10/12/99 Mich. Ct. App. Opinion ("MCOA Op."), docket #28.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals.  Petitioner was granted leave to amend his application, in which he further developed his first issue.  By order entered April 29, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #29.)

## Discussion

This action is governed by the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA").  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing

*Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## I.      Prosecutorial Misconduct

Petitioner's first claims that the prosecutor's comments regarding the absence of an alibi witness that she knew Petitioner could not produce, constituted misconduct and resulted in the denial of a fair trial.  On direct examination, Petitioner testified that he was at the home of a friend, Darren Ewing, from 4:00 or 5:00 p.m. until about 8:30 p.m. on June 3, 1998.  (Tr III, 106-107.)  He further testified that he went from Ewing's house to the home of another friend, Terry Harrison, where he spent the rest of the night.  (Tr III, 107-108.)  On cross-examination, the prosecutor asked Petitioner, "Do we have Darren Ewing here?"  (Tr III, 116.)  Petitioner responded, "No, he's not."

(Tr III, 116.) The trial court sustained defense counsel's objection to the form of the question and instructed the prosecutor to move on. The prosecutor again asked, "Is he here," referring to Darren Ewing. (Tr III, 117) Upon the renewed objection of defense counsel, the trial court called a recess.

Outside the presence of the jury, defense counsel moved for a mistrial as a result of the prosecutor's questions regarding Darren Ewing. (Tr III, 117.) The prosecutor was aware that Petitioner's investigator had talked to Ewing on July 10. The following day, Ewing gave a tape-recorded statement that was favorable to Petitioner. Defense counsel provided the prosecutor with a copy of the interview. The prosecutor also knew that the defense investigator served Ewing with a subpoena, but Ewing failed to appear to testify at trial. Further efforts by police to locate Ewing during trial were unsuccessful. (Tr III, 120-122; Tr IV, 11; Respondent's Answer in Opposition, 11.) The trial court sustained the objection to the form of the prosecutor's question, particularly where she was aware that Ewing had been subpoenaed and could not be located. The trial court, however, denied Petitioner's motion for mistrial because the prosecutor was permitted to argue or comment on Petitioner's failure to call corroborating witnesses. (Tr III, 120-123.)

In her closing argument, the prosecutor again asked, "Where is Darren Ewing?" (Tr III, 173.) After the trial court overruled the objection of defense counsel, the prosecutor continued:

> Ladies and gentlemen, when Mr. Traylor, again, chooses to produce a defense and fails to call corroborating witness or witnesses in support, you may take that as a lie. You may take that as consciousness of guilt. No Darren Ewing. No Mr. Harrison.

(Tr III, 174.) Defense counsel renewed his motion for mistrial following closing arguments in light of the prosecutor's comment that Petitioner's failure to produce Darren Ewing shows consciousness of guilt. (Tr IV, 17.) The trial court agreed that the prosecutor's argument was "a bad choice of words" because it improperly suggested that Ewing's testimony would have been adverse to the

defense when the facts before the court suggested that his testimony would have been favorable to the defense.  (Tr IV, 21.)  The court concluded that the issue could be resolved with a curative instruction, and, thus, denied Petitioner's motion for mistrial.  (Tr IV, 21.)  The court subsequently instructed the jury that "The defendant's failure to call witnesses to support his defense does not cast the burden upon the defendant to prove his innocence, since the defendant cannot be convicted upon the basis that he failed to affirmatively prove his defense."  (Tr IV, 32.)

Petitioner argues that the prosecutor's misleading comments regarding the absence of an alibi witness that the prosecutor knew he could not produce, amounted to misconduct and violated his rights to due process and to cross-examine witnesses against him.  He contends that by commenting on the missing alibi witness that the prosecutor knew he could not produce and then asking the jury to infer guilt from the absence of the witness, the prosecutor engaged in intentional misconduct.  Furthermore, Petitioner argues that the prosecutor's misconduct shifted the burden of proof in violation of the presumption of innocence.  Petitioner also contends that the prosecutor's comments injected new evidence into the case for which she was not subject to cross-examination in violation of his Fifth Amendment right of confrontation.  In light of the weak identification evidence presented at trial, Petitioner maintains that the prosecutor's misconduct cannot be found harmless.

For relief to be granted on a claim of prosecutorial misconduct, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Frazier v. Huffman,* 343 F.3d 780, 791 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095 (2004).  The Sixth Circuit has adopted a two-step approach for determining whether

- 10 -

prosecutorial misconduct violates a defendant's due process rights. *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001); *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (utilizing this test to evaluate a due process claim based upon prosecutorial misconduct raised in a post-AEDPA habeas petition). The Court must first consider whether the prosecutor's conduct and remarks were improper. *Carter*, 236 F.3d at 783. If the Court finds that the remarks were improper, it must apply the four-factor test set forth in *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994), to determine whether the impropriety violated the defendant's due process rights. *Carter*, 236 F.3d at 783. The four factors are as follows: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Carroll*, 26 F.3d at 1385.

In rejecting Petitioner's claim of prosecutorial misconduct on appeal, the Michigan Court of Appeals stated:

> Defendant first argues that he was denied a fair and impartial trial because the prosecutor's comments on the absence of his corroborating alibi witness tended to shift the burden of proof from the prosecution to him. We disagree. Allegations of prosecutorial misconduct are reviewed case by case. *People v Schutte*, 240 Mich App 713, 721; 613 NW2d 370 (2000). We examine the pertinent portions of the record and view the alleged misconduct in light of the defendant's arguments and the evidence admitted at trial. *Id*.

> Prosecutorial comments that infringe on a defendant's right not to testify may constitute error; however, where a defendant testifies at trial and advances an alternative theory of the case that would exonerate him from the crime, prosecutorial comments on the validity of the theory do not shift the burden of proof to the defendant. *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995). Once a defendant makes an issue legally relevant by advancing a theory, the prosecutor is permitted to comment on the improbability of the defendant's theory. *Id*. at 115-116. Arguing that a witness or evidence does not exist attacks defendant's credibility and questions the reliability of a defendant's theory. *Id*. at 106-107. Further, a prosecutor

is permitted to comment on a defendant's failure to produce corroborating witnesses whenever the defendant takes the stand and testifies on his own behalf. *People v Spivey*, 202 Mich App 719, 723; 509 NW2d 908 (1993), overruled on other grounds 450 Mich 1025 (1996). Here, the prosecutor's remarks during cross-examination and closing argument were proper responses to defendant's assertion that the police had the wrong man and that he had an alibi.

(MCOA OP. at 1.)   Therefore, the Michigan Court of Appeals concluded that the prosecutor's comments on cross-examination and closing argument were a proper response to Petitioner's alibi defense and did not shift the burden of proof.

A prosecutor's comments regarding a missing alibi witness implicate a variety of constitutional protections.  For example, a defendant in a criminal case has a constitutional right against compelled self-incrimination.  U.S. Const., Amend. V.  To effectuate this right, a prosecutor may not make any reference to or comment upon a defendant's failure to testify.   *Griffin v. California*, 380 U.S. 609 (1965).  In taking the stand, Petitioner waived his right to remain silent. *See Brown v. United States*, 356 U.S. 148, 155-56 (1958).  Accordingly, Petitioner's Fifth Amendment right against self-incrimination is not at issue in this case.  Petitioner contends the prosecutor's comments injected new evidence into the case for which she was not subject to cross-examination in violation of his Fifth Amendment right to confrontation.  I disagree.  Before the prosecutor made any of the comments at issue in this case, Petitioner testified that he was with Mr. Ewing on the night of the murder.  By commenting on Mr. Ewing's absence from trial, the prosecutor was not presenting the jury with any new evidence.  Rather, the prosecutor was asking the jury to draw an inference against Petitioner in light of Mr. Ewing's absence.  Accordingly, Petitioner's claim that the prosecutor violated his right of confrontation is without merit.

Petitioner also contends that the prosecutor's comments regarding the missing alibi witnesses shifted the burden of proof to the defense. "[T]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). The state carries the burden of proving each and every element of a criminal offense beyond a reasonable doubt, and any conduct that shifts that burden to a defendant constitutes a violation of due process. *See Carella v. California*, 491 U.S. 263, 265 (1989); *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979). Under certain circumstances, however, a prosecutor may comment on a missing witness and request an adverse inference instruction without shifting the burden of proof. The "missing witness rule" originated from *Graves v. United States*, 150 U.S. 118, 121 (1893), where the Supreme Court stated in dictum:

> [I]f a party has it peculiarly within his power to produce [evidence or] witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the [evidence or] testimony, if produced, would be unfavorable.

Assuming a prosecutor is generally allowed to make an absent-witness argument, *United States v. Schultz*, 698 F.2d 365, 376 (8th Cir. 1983) ("The prosecutor is free to comment on the failure of the defendant to call an available alibi witness."), commenting on an absent witness clearly is impermissible under a number of circumstances. For example, it is impermissible for a prosecutor to comment on the absence of a witness when the prosecutor knows that the witness would have invoked his Fifth Amendment right against self-incrimination, or if the person is a co-defendant, accomplice not on trial, or a person already convicted of the same act for which the defendant is on trial. *See United States v. Miller*, 460 F.2d 582 (10th Cir. 1972) (it was improper for prosecutor to remark during argument to jury regarding defendants' failure to call their co-

- 13 -

defendants to testify as to Count II of indictment where although co-defendants had pled guilty to Count III of indictment they were still subject to prosecution under Count II and possibly would invoke privilege against self-incrimination if subpoenaed).

Similarly, it is improper for a prosecutor to mislead the jury to believe that the absent witness would refuse to testify, when the prosecutor is aware that the witness signed a cooperation agreement and would be required to testify. *See United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993). Furthermore, federal courts have found prosecutorial misconduct where the prosecutor commented on the defendant's failure to call a witness when the threats of the prosecutor drove the witness from the stand. *See United States v. Golding,* 168 F.3d 700 (4th Cir. 1999) (prosecutor engaged in misconduct warranting reversal of conviction when she threatened defendant's wife with prosecution to prevent wife from testifying that she, and not defendant, owned shotgun underlying his prosecution for possession of firearm by convicted felon, and then in closing arguments repeatedly called to jury's attention wife's failure to testify and argued that it was indicative of falsity of defendant's claim that shotgun belonged to wife); *United States v. Vavages*, 151 F.3d 1185 (9th Cir. 1998) (the prosecutor engaged in misconduct when he suggested to the jury that it draw significance from the failure of the defense to call a witness when the government had threatened to withdraw the witness's plea agreement and charge the witness with perjury if she testified).

Under circumstances very similar to those presented in this case, the Ninth Circuit found that the prosecutor improperly misled the jury. *See United States v. Leon-Gonzalez*, No. 00-50698, 2001 WL 1485876 (9th Cir. Nov. 21, 2001). In *Leon-Gonzales*, the prosecutor, who was aware that the witness had jumped bail and absconded, suggested to the jurors that they draw an adverse inference from the failure of the defense to call the witness. The Court held that by "asking

- 14 -

the jury to draw the inference that the defense deliberately chose not to call the witness because the witness would testify unfavorably, the government was misrepresenting the underlying facts." *Id.* at *1. While *Leon-Gonzales* did not involve direct action by the prosecutor that prevented the witness from testifying, the court concluded that it was equally improper for the prosecutor to urge the jury to draw an inference against the defendant from the failure of the witness to appear when the prosecutor was aware of the true reason for the witness' absence. *Leon-Gonzalez*, 2001 WL 1485876, at *1.

In this case, it is undisputed that the prosecutor knew that Petitioner had subpoenaed Darren Ewing for trial, but Ewing had failed to appear. (Tr III, 120.) In addition, the prosecutor was aware that Gregory Jones, the officer in charge of the case, made further efforts to locate Mr. Ewing to no avail. (Tr III, 120-121.) The prosecutor had also received a copy of an interview with Mr. Ewing by the case investigator in which Mr. Ewing made statements favorable to Petitioner. (Tr IV, 11.) Notwithstanding the facts in her knowledge, the prosecutor asked Petitioner, "Where is Ewing?" After the trial court sustained defense counsel's objection to the form of the question and asked the prosecutor to "move on," the prosecutor again asked Petitioner, "Is he [Darren Ewing] here?" Again, in her closing argument, the prosecutor asked "Where is Darren Ewing?" and asked the jurors to infer consciousness of guilt from Petitioner's failure to call corroborating witnesses. Because the prosecutor knew that Ewing could not be found, asking the jury to draw such an inference was clearly improper. *See Carter*, 236 F.3d at 785.

Because the prosecutor's conduct was improper, I must consider the four *Carroll* factors to determine whether the prosecutor's improper conduct deprived Petitioner of his right to due process. The first factor is whether the conduct and remarks of the prosecutor tended to mislead

- 15 -

the jury or prejudice the defendant.  *See Carroll*, 26 F.3d at 1385.  I find that the prosecutor's comments were intended to mislead the jury with regard to Darren Ewing's absence.  However, in considering the first factor, the Sixth Circuit has held that "[o]rdinarily, a court should not overturn a criminal conviction on the basis of a prosecutor's comments alone, especially where the district court has given the jury an instruction that may cure the error."  *Carter*, 236 F.3d at 787; *see also United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (holding that "the prejudicial effect of improper comments may be negated by curative instructions to the jury").  In this case, the trial court instructed the jury during final instructions that "[t]he defendant's failure to call witnesses to support his defense does not cast the burden upon the defendant to prove his innocence, since the defendant cannot be convicted upon the basis that he failed to affirmatively prove his defense."  (Tr IV, 32.)  Therefore, while the prosecutor's comments tended to mislead the jury, the court provided a curative instruction.

I must next consider whether the conduct or remarks were isolated or extensive.  *See Carroll*, 26 F.3d at 1385.  With regard to the second factor, the Sixth Circuit has held that a verdict should not be overturned unless the prosecutorial misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial."  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotation omitted).  In this case, the prosecutor inquired twice as to Darren Ewing's whereabouts during her cross-examination of Petitioner.  During her closing argument, she again asked, "Where is Darren Ewing?" and asked the jury to infer consciousness of guilt from Petitioner's failure to call witnesses to corroborate his alibi.  In the context of the full trial, I find that the prosecutor's conduct to be neither isolated nor pervasive.

- 16 -

The third factor is whether the remarks were deliberately or accidentally made. Without question, the prosecutor's conduct was intentional in this case. It is clear from the record that the prosecutor was aware that Petitioner had served Ewing with a subpoena, but he failed to appear to testify at trial. The prosecutor also was aware that further efforts by police to locate Ewing were unsuccessful. Despite her knowledge, the prosecutor intentionally asked Petitioner "Do we have Darren Ewing here?" (Tr III, 116.) The prosecutor's statements during rebuttal argument, asking the jury to infer consciousness of guilt from Petitioner's failure to call witnesses to corroborate his alibi, were particularly flagrant and deliberate.

With regard to the fourth factor, I find that the evidence against Petitioner was strong. Petitioner admitted that he was with Hill from 7:00 a.m. to 4:00 p.m. on June 3. He also testified that he was wearing a black baseball cap and a red or orange jacket that day. (Tr III, 110.) Petitioner further testified that he had a conversation with James Longberger on the front porch of Hill's house. (Tr III, 103-104.) Anthony Givens positively identified Petitioner at trial as the man leaving Hill's house on the night of June 3 with a 2"x4" in his hand. (Tr II, 106-107.) He picked Petitioner out of a photographic lineup the following day. (Tr II, 112-15.) Other neighbors provided strong circumstantial evidence that Petitioner was the person who inflicted the injuries that resulted in Hill's death. Cheryl Toliver and Rosa Daniels testified to seeing a man at Hill's house on June 3. Toliver described the man as six feet tall, wearing a baseball cap and a red and a black jacket. (Tr II, 91.) Daniels also testified that the man was wearing a baseball cap. (Tr II, 75, 78.) Both women saw the man sitting on Hill's front porch talking to Mr. Longberger. (Tr II, 72-74, 85-86.) Later that evening, Toliver saw the same man coming out of Hill's house with a piece of 2"x4" in his hand. (Tr II, 87.) When the man tried to start Hill's car, he set off of the car alarm. Both women saw the

man get out of Hill's car and flee on foot.  (Tr II, 76, 87.)  Two other witnesses, Noel Malone and

Corey Brown, also saw a man leaving Hill's home with a 2"x4" in hand.  (Tr II, 57, 68, 166.)

Malone and Brown described the man as 5'11" or taller, wearing a black baseball cap and jacket.

(Tr II, 60-61, 167-68.)  They also saw the man try to start Hill's car before running away.  (Tr II, 57,

166.)  The piece of 2"x4" recovered from Hill's car had blood on one end.  (Tr II, 63, 86.)

Weighing the four factors, I find that Petitioner was not denied a fair trial as a result

of the prosecutor's references to Petitioner's missing alibi witnesses.  While the prosecutor's

questions and comments regarding Darren Ewing's whereabouts were intentionally misleading and

asking the jury to draw an improper inference, her conduct was not pervasive and did not render the

trial fundamentally unfair in light of the trial court's curative instruction and the strong evidence

presented of Petitioner's guilt.  Accordingly, Petitioner is not entitled to habeas corpus relief.

## II.      Instruction on Cognate Lesser Offense

In his second ground for habeas corpus relief, Petitioner contends that the trial court

erred in denying Petitioner's request for a jury instruction on the cognate lesser offense of assault

with intent to do great bodily harm less than murder.  Given Dr. Bader Cassin's testimony, defense

counsel argued that a question of fact existed as to whether Hill may have survived her injuries but

for a number of other factors, including  her history of seizures, her cocaine use and the fact that she

developed acute bronchial pneumonia in the hospital.  (Tr III, 135-36.)  The trial court found that an

instruction on assault with intent to do great bodily harm less than murder was not appropriate

considering the totality of the evidence presented in the case.  (Tr III, 139.)

The Sixth Circuit Court of Appeals, sitting *en banc*, has held that the failure to give

an instruction on a lesser-included offense, even when requested by counsel, is not of the "character

or magnitude which should be cognizable on collateral attack."  *Bagby v. Sowders*, 894 F.2d 792,

797 (6th Cir. 1990) (*en banc*).  The *Bagby* Court held that failure to instruct on lesser-included

offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a

miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair

procedure.  *Id.*; *accord Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002), *cert. denied*, 537 U.S. 1192

(2003); *Todd v. Stegal*, Nos. 00-2203, 98-72656, 09-29-00, 2002 WL 554500, at *2-3 (6th Cir. April

12, 2002); *Samu v. Elo*, No. 00-1184, 2001 WL 814929, at *1 (6th Cir. July 9, 2001); *Williams v.

Hofbauer*, No. 00-1526, 2001 WL 133135, at *2 (6th Cir. 2001).  Here, there is no miscarriage of

justice or a fundamental defect in due process.  As set forth above, the prosecutor presented

substantial evidence of Petitioner's guilt.  Furthermore, no clearly established Supreme Court

authority requires lesser-included offense instructions in non-capital cases.  Thus, under the AEDPA,

28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief.  *Samu*, 2001 WL 814929, at *1

(citing *Williams*, 29 U.S. at 376-80).

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Date:  August 1, 2005                             /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections
may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th
Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).